**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**SOUTHERN DIVISION**

| | |
|---|---|
| **ESTATE OF DEMONTE WARD-BLAKE**<br>c/o Murphy, Falcon & Murphy, P.A<br>1 South Street, Suite 3000<br>Baltimore, MD 21202<br><br>and<br><br>**RENA WARD,** Individually and<br>on behalf of the Estate of Demonte Ward-Blake<br>c/o Murphy, Falcon & Murphy, P.A<br>1 South Street, Suite 3000<br>Baltimore, MD 21202<br><br>    *Plaintiffs*<br><br>v.<br><br>**PRINCE GEORGE'S COUNTY, MARYLAND**<br>Wayne Curry Administration Building<br>1301 McCormick Drive<br>Largo, Maryland 20774<br><br>    Serve on:    Rhonda L. Weaver<br>                  County Attorney<br>                  1301 McCormick Drive<br>                  Suite 4100<br>                  Largo, Maryland 20774<br><br>and<br><br>**BRYANT W. STRONG**<br>Individually and in his official capacity<br>as a Prince George's County Police Officer<br><br>    Serve on:    Malik Aziz<br>                  Chief of Police<br>                  Prince George's County Police<br>                    Department<br>                  8801 Police Plaza<br>                  Upper Marlboro, Maryland 20772<br><br>    *Defendants* | <br><br><br><br><br><br>Case No. _____ |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Rena Ward, individually and on behalf of the Estate of Demonte Ward-Blake (collectively, "Plaintiffs"), by and through undersigned counsel, hereby files this Complaint against Prince George's County, Maryland and Bryant W. Strong (collectively, "Defendants"), and states as follows:

## INTRODUCTION



For 50 plus years, Prince George's County government has condoned the widespread brutality inflicted by its police officers against County residents, refusing to implement effective training, oversight, or disciplinary measures to prevent its officers from committing illegal and unconstitutional actions. Prince George's County Police Department ("PGPD") leaders knew or should have known that their officers would likely commit these civil rights violations without proper training, oversight, and discipline, but they simply did not care enough to protect the rights of the community against police misconduct. The above picture is the predictable result of Prince George's County leadership's deliberate indifference to the rights of their citizens. This image of Plaintiff Demonte Ward-Blake as he lay in Shock Trauma on a respirator, is the tragically foreseeable outcome of a failed and biased system of policing in Prince George's County, to which County leaders turned a blind eye.  Plaintiff Demonte Ward-Blake paid the ultimate price for their unacceptable apathy.

## PARTIES JURISDICTION AND VENUE

1.      Plaintiff Rena Ward ("Ms. Ward") is an adult who resides in Maryland. Ms. Ward is the mother of Demonte Ward-Blake and the Personal Representative of the Estate of Demonte Ward-Blake. She sues individually and on behalf of the Estate of Demonte Ward-Blake, who shall be referred to herein as the "Decedent", "Ward-Blake", or "Demonte".

2.      Defendant Prince George's County, Maryland ("County") is a municipal corporation organized under the provisions of Art. XI-A of the Maryland Constitution. At all times relevant hereto, Defendant County, through its final policymakers with final policymaking authority, including but not limited to the Chief of PGPD, agents, servants, and employees, hired, supervised, trained, and employed Defendant Strong and the entire PGPD police force. By virtue of its status as a governmental entity that exercised power delegated by the State of Maryland, the

County acted under the color of state law when it hired, trained, supervised, and retained Defendant Bryant Strong and its entire police force. The County is a "person" under 42 U.S.C. §1983 and is not immune under the Eleventh Amendment.

3.      Defendant Bryant W. Strong ("Defendant Strong" or "Strong") is a Prince George's County Police Officer, employed by Defendant County as a sworn police officer of the PGPD. Upon information and belief, Strong currently resides within the State of Maryland.

4.      This Complaint contains claims arising under the Fourth and Fourteenth Amendments to the United States Constitution and asserts claims for relief pursuant to 42 U.S.C. § 1983, the Maryland Constitution, and claims under Maryland State law.

5.      Jurisdiction of this Court arises under 28 U.S.C. § 1343 and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(b) because the events, acts, and omissions complained of herein all occurred within this District.

7.      Plaintiffs have satisfied all conditions precedent necessary to the filing of these claims.

## FACTS OF THE CASE

8.      On October 17, 2019, Demonte took his last steps; and experienced his last moment of life that was not saturated with intense and immeasurable pain. For the next six hundred and fifty-three days, Demonte's life was a living hell. Then, because he was so injured, he ultimately died.

9.      On that day, PGPD Corporal Bryant W. Strong #3881 intentionally and viciously slammed Demonte on his face, after he was already handcuffed behind his back.

10.     As a direct and proximate result of Defendant Strong's actions above, Ward-Blake suffered from:

a.  Unconsciousness;

b.  Traumatic injury to the left vertebral artery risking the cerebellum and the medulla oblongata;

c.  Multiple cervical fractures at C4;

d.  Multiple cervical fractures at C5;

e.  Compression fractures at C5, causing the loss of vertebral body height;

f.  A broken nose;

g.  Traumatic disc herniation at C4;

h.  Traumatic disc herniation at C5;

i.  Traumatic disc herniation at C6;

j.  Traumatic tears of the cervical ligaments causing spinal detachment;

k.  Bulging vertebra throughout the spine;

l.  Muscle swelling;

m.  Intra-spinal swelling;

n.  Intra-spinal bleeding;

o.  Fluid buildup in the pharynx;

p.  Fluid buildup in the larynx;

q.  Fluid buildup in the esophagus;

r.  High fevers;

s.  Mobitz Type I 2nd Degree atrioventricular block;

t.  Required a feeding tube;

 u. Required a catheter to be inserted through his penis into the bladder;

 v. Required a colostomy bag to be attached to his body;

 w. Ingestion of over 30 different prescriptions including but not limited to fentanyl, baclofen, propofol, and potassium chloride;

 x. Difficulty breathing;

 y. Difficulty speaking;

 z. Difficulty sleeping;

 aa. Difficulty eating;

 bb. Difficulty using the bathroom;

 cc. Severe anxiety;

 dd. Severe depression;

 ee. Post-traumatic stress disorder;

 ff. Loss of dignity, self-respect, and self-worth; and

 gg. Traumatic spinal cord compression/flattening, causing permanent quadriplegia.

11. Ward-Blake was transported by ambulance to Prince George's County Hospital and admitted to the Intensive Care Unit. However, that hospital was unable to treat the extent of Ward-Blake's injuries, and he was transported by emergency helicopter to the University of Maryland Shock Trauma Center in Baltimore City.

12. Ward-Blake was assessed to be at an immediate and severe risk of respiratory failure (such risk which was directly and proximately caused by Defendant Strong's actions), and therefore, he had to be intubated before going into emergency anterior and posterior cervical discectomy and fusion surgery of the C4 and C5 vertebra. This surgery required the removal of Ward-Blake's vertebral discs in order to decompress his spinal cord. At the same time, surgeons

also fused his vertebra with Medtronic bone, and inserted plates, rods, and screws into his spine. Despite these efforts, Ward-Blake's quadriplegia was not cured.

13.     Instead of a cure, after the surgery, Ward-Blake's condition deteriorated, and his condition remained poor for the three weeks that he was a patient at Shock Trauma. After being released from Shock Trauma, Ward-Blake spent another six weeks in the University of Maryland Rehabilitation Center. There he underwent daily:

       a.   Functional mobility training

       b.   Neuromuscular re-education;

       c.   Pain management;

       d.   Occupational therapy;

       e.   Speech therapy; and

       f.   Physical therapy.

14.     Despite the efforts of the physical therapists, Ward-Blake's kinesthetic ability and his overall condition did not improve. Ultimately, Ward-Blake was determined to be permanently and nearly completely disabled as measured by the American Medical Association, which exacerbated his emotional suffering.

15.     On August 1, 2021, Ward-Blake died. Upon information and belief, including but not specifically limited to the fact that Maryland's Chief Medical Examiner determined that Ward-Blake's flattened spine contributed to his death, Defendants actions were ultimately a proximate cause of Demonte's death.

16.     As a direct and proximate result of Defendants' actions causing the suffering and death of Ward-Blake, Ms. Ward has suffered, and will continue to suffer from mental anguish, emotional pain and suffering, loss of society, loss of comfort, loss of protection, loss of filial care,

loss of attention, loss of advice, loss of counsel, loss of training, loss of services, loss of guidance, and loss of education, as well as medical expenses, legal fees, and other damages.

17.     Upon information and belief, Defendant Strong's actions on October 17, 2019 were not an isolated incident of using excessive force, and PGPD knew or recklessly failed to learn that Defendant Strong had an ongoing propensity for unlawful violence and uses of police force against citizens and failed to take corrective or mitigating steps to ensure the public's Constitutional rights were not at further risk, which directly and proximately caused Decedent Ward-Blake's and Ms. Ward's injuries and damages.

18.     Upon information and belief, including but not exclusively limited to the fact that Defendant Strong had a known propensity for unlawful violence and use of police force, but was allowed to continue carrying a badge, County failed to adequately train, supervise, investigate, and/or discipline Defendant Strong at any point. Such failures directly and proximately caused Plaintiffs the foreseeable injuries and damages as alleged in this lawsuit.

19.     Upon information and belief, including but not exclusively limited to the fact that between 1990-2001 PGPD officers shot and killed more people per officer than any of the 50 largest law enforcement agencies in the country and during that period, where the decedents' race was identified, Blacks comprised 84% of those killed, PGPD has a more than fifty-year custom of looking with a blind eye at racist excessive force as well as excessive force in general. A sampling of such force includes:

        a.     In the 1960's, the decade in which PGPD created an undercover "Death Squad," (which was tasked with entrapping and arresting Black people) at least two Black men were killed without legal justification, and another was seriously injured.

b. In 1977, a PGPD officer unlawfully shot and killed an unarmed Black man over $14.00 worth of ham.

c. In 1978, PGPD was put on notice, based on one of its officers interviewing to the Washington Post, that it had a brutality issue in its ranks. Instead of addressing this issue, PGPD "encouraged" it;

d. Also in 1978, PGPD was put on notice based on one of its officers' public statements, that it had a racism issue in its ranks, to the extent that the officer "wouldn't rule out [PGPD] police membership in the Klan";

e. Also in 1978, PGPD officers handcuffed Terrence Johnson, a black 15-year-old boy, to a chair and then beat him;

f. In 1989, PGPD officers beat Gregory Habib to death. In the same incident where the officers killed Mr. Habib, they broke Martin Habib's jaw, and cost the taxpayers $1,900,000.00 due to a jury verdict;

g. In July of 1990, PGPD officers beat Kirk Simms, an elementary school guidance counselor. In November of 2000, a jury awarded him $900,000.00 for the violation of his rights. One week prior to the Simms verdict, a different federal jury awarded a total of $300,000.00 to a group of twelve people who had also been illegally arrested by PGPD officers in 1995;

h. In 1993, PGPD Officer Kevin Davis threw a man to the ground for no reason and a jury awarded the man $12,500.00. Instead of firing Davis, PGPD eventually promoted him to Deputy Chief in 2009;

i. Also in 1993, PGPD officers searched Archie Elliott for weapons, handcuffed him behind his back, placed him in a police car, and then put the seatbelt on

him. They then shot him 22 times, and as justification, they asserted that a weaponless Elliott somehow "wielded a gun" at them;

j.  In 1994, PGPD officers arrested a man without justification. That man happened to be a police officer from the District of Columbia;

k.  In 2016, PGPD officers illegally search, tackled, and punched in the face, another District of Columbia officer;

l.  In 2017, PGPD officers attacked and put to the ground another out of town police officer;

m.  In 1995, PGPD officers unleashed a police dog to maul Ricardo Mendez and Herra Cruz. The officer, Stephanie Mohr was federally indicted for civil rights violations, was convicted, and sent to prison;

n.  In 1997, PGPD officers ordered a police dog to attack Luis Azurdia. A resulting lawsuit was settled in 2002;

o.  Also in 1997, PGPD officers followed a Black man home, entered his house without consent or a warrant and pepper sprayed him. Other PGPD officers then sent a police dog to attack him and stomped him into the ground. Then, after ordering the man to crawl away, they called him a "dumb nigger" and beat him with a metal stick to, in their words, "teach him for trying to run." During the beating, they repeatedly unleashed the dog to attack him. This cost the taxpayers $4,100,000.00 due to a jury verdict;

p.  In 1999, a PGPD officer shot Gary Hopkins, who was unarmed. The officer's report was flatly contradicted by numerous witnesses who alleged that the shooting was unprovoked. Although the officer was charged criminally, the

State torpedoed the prosecution of the case by assigning an unprepared rookie prosecutor.

q. In 2000, a PGPD officer stalked and killed Prince Jones, shooting at him 16 times, and hitting him 8 times in his back. The officer's report was flatly contradicted by numerous witnesses, but the State's Attorney who had never indicted an officer refused to even present the case to Grand Jury, let alone prosecute him. This cost the taxpayers $3,700,000.00 due to a jury verdict;

r. In 2006, a PGPD officer shot and killed a man, which resulted in another lawsuit and settlement;

s. In 2009, a PGPD officer slammed Javon Chestnut to the ground for no reason. A lawsuit was filed, but ultimately dismissed for reasons unrelated to the merits of the case;

t. In 2010, PGPD officer hit Steven Morales with a closed fist, literally knocking him off his feet, then choked him. This cost the taxpayers $121,140.00 due to a jury verdict;

u. Also in 2010, PGPD officers beat ten students for no reason. This cost the taxpayers $3,600,000.00 due to a jury verdict;

v. In 2011, a PGPD officer punched a 13-year-old boy three times in the face, then pointed a gun at his head. The officer, Rickey Adey was charged, but acquitted;

w. Also in 2011, PGPD lost *Espina, et al. v. Jackson, et al.*, Case No.: CAL09-23501 at trial, costing taxpayers $11,500,000.00 for yet another use of excessive police force.

x.  In 2013, PGPD settled *Johnson v. Prince George's County, Maryland, et al.*, Case No.: 8:10-cv-00582-DKC for yet another use of excessive police force.

y.  In 2014, a PGPD officer was indicted for assaulting a high schooler. This use of force was deemed excessive by PGPD Internal Affairs Division;

z.  Also in 2014, a PGPD officer was indicted for assaulting someone in handcuffs. This use of force was deemed excessive by PGPD Internal Affairs Division;

aa. Also in 2014, a PGPD officer assaulted two citizens while they were handcuffed. This use of force was deemed excessive by PGPD Internal Affairs Division;

bb. Also in 2014, a PGPD officer beat a child who was detained in a holding cell. This use of force was deemed excessive by PGPD Internal Affairs Division;

cc. Also in 2014, a PGPD officer struck an innocent citizen in the head with a metal stick. This use of force was deemed excessive by PGPD Internal Affairs Division;

dd. Also in 2014, a PGPD officer grabbed an innocent citizen by the hair and threw him head first into the ground, then after putting his knee into the victim's neck, handcuffed him, then picked him up by the hair and threw him into a wall. This use of force was deemed excessive by PGPD Internal Affairs Division;

ee. Also in 2014, a PGPD officer punched and slapped someone in handcuffs and tried to cover up the use of force. This use of force was deemed excessive by PGPD Internal Affairs Division;

ff. Also in 2014, a PGPD officer kicked and punched a detainee without justification or excuse. This use of force was deemed excessive by PGPD Internal Affairs Division;

gg. Also in 2014, a PGPD officer slapped a detainee for not looking into his eyes during an interrogation. This use of force was deemed excessive by PGPD Internal Affairs Division;

hh. In 2015, a PGPD officer was convicted for holding his gun to someone's head. This use of force was deemed excessive by PGPD Internal Affairs Division;

ii. In 2015, PGPD lost *Butler v. Windsor, et al.*, Case No.: 8:13-cv-0883-PWG at trial for yet another use of excessive police force;

jj. In 2016, PGPD settled *Anderson, v. Prince George's County, Maryland, et al.*, Case No.: 8:13-cv-01509-TDC for yet another use of excessive police force;

kk. Also in 2016, PGPD settled *Canada-Malcolm v. Prince George's County, Maryland, et al.*, Case No.: 8:14-cv-02150-PJM for yet another use of excessive police force;

ll. Also in 2016, PGPD settled *Ulloa v. Prince George's County, Maryland, et al.*, Case No.: 1:18-cv-00260-DKC for yet another use of excessive police force;

mm. Also in 2016, PGPD lost *Jones v. Allen, et al.*, Case No.: 8:15-cv-01173-PX at trial for yet another use of excessive police force;

nn. In 2016, a PGPD officer used his police car as a weapon to hit someone running away. The officer, Juan Hernandez was indicted and convicted for this incident;

oo. Also in 2016, a PGPD officer woke up a sleeping homeless person, and then, because she was not fast enough, he picked her up by her ears, and slapped her in the face. He was convicted and sentenced to jail for his actions;

pp. Also in 2016, a PGPD officer dragged a citizen off his own property. When the person's fiancée started recording the incident, the officer knocked her phone to the ground and then picked him up by the back of his pants. This use of force was deemed excessive by PGPD Internal Affairs Division;;

qq. Also in 2016, a PGPD officer arrested a citizen for videotaping the arrest of someone else and tackled him to the ground for no reason. This use of force was deemed excessive by PGPD Internal Affairs Division;

rr. In 2017, PGPD settled *Queen v. Prince George's County, Maryland, et al.*, Case No.: 8:14-cv-02941-PWG for yet another use of excessive police force;

ss. Also in 2017, PGPD settled *Brown v. Cpl. Edwin Hernandez, et al.*, Case No.: 8:15-cv-03687-GJH for yet another use of excessive police force;

tt. In 2017, a PGPD officer punched Kevin Sneed several times and threw him to the ground for no reason. Then multiple officers began kicking and punching him, even though he was already handcuffed, and threatened to murder him. The officers falsely charged Mr. Sneed with numerous crimes, including attempted murder. After his acquittal, Mr. Sneed sued the officers, his lawsuit remains pending;

uu. Also in 2017, a PGPD officer put a gun to a detainee's head for no reason. This use of force was deemed excessive by PGPD Internal Affairs Division;

vv. Also in 2017, a PGPD officer hit a citizen with his car because he would not consent to a search of his person. This use of force was deemed excessive by PGPD Internal Affairs Division;;

ww. In 2018, PGPD settled *Goines v. Prince George's County*, Case No.: 8:16-cv-00463- RWT for yet another use of excessive police force;

xx. In 2018, a PGPD officer raped a woman he pulled over, and is awaiting a criminal trial;

yy. Also in 2018, PGPD officers arrested Andre Verdier, cuffed him, and put him in a police car. Corporal Stephen Downey, upon realizing that particular police car did not have a camera inside, punched Mr. Verdier in the head multiple times for no reason, then falsely charged him with crimes. After those were dismissed, Mr. Downey was charged with assault and convicted and sent to jail.

zz. Also in 2018, a PGPD officer punched an arrestee who was already secured. This use of force was deemed excessive by PGPD Internal Affairs Division;

aaa. Also in 2018, a PGPD officer punched an arrestee twice in the face even though he was already handcuffed. This use of force was deemed excessive by PGPD Internal Affairs Division;

bbb. Also in 2018, PGPD lost *Rafael Holbrook, et al., v. Officer Khalid Rasuli, et al,* Case No.: CAL16-36619 at trial and cost taxpayers $641,000.00 for yet another use of excessive police force;

ccc. In 2020, PGPD settled *Jacobs v. Bd. Educ. of Prince George's County, et al.*, Case No.: 8:17-cv-00678-PWG for yet another use of excessive police force;

    ddd. Also in 2020, PGPD settled *Whitefield v. Prince George's County, Maryland, et al.*, Case No.: 8:19-cv-03000-TDC for yet another use of excessive police force.

    eee. From January of 2019 to January of 2020, PGPD Cpl. Michael Owen used excessive force against no less than five county residents in five similar series of events throughout that year, culminating with Owen shooting and killing William H. Green on January 27, 2020, who was handcuffed behind his back and locked into Owens police cruiser. Owen was immediately charged with 2nd Degree Murder, was held without bail as a danger to the community, and is scheduled for trial in February of 2023. Prince George's County settled Mr. Green's excessive force claim for $20 million in September of 2020.

20.    Upon information and belief, including but not exclusively limited to the fact that numerous PGPD officers accused the department of retaliation against those officers who report misconduct of other officers, especially when a minority officer reports the misconduct of a white officer, PGPD has a custom of permitting and promoting racial violence against its citizens.

21.    Upon information and belief, including but not exclusively limited to the fact that PGPD Officer Thomas Boone, while in the position of Assistant Commander of PGPD District 2, publicly admitted that PGPD has continually operated under a pattern and practice of failing to properly investigate complaints and/or failing to complete investigations into allegations of misconduct against its officers by citizens, PGPD has a pattern and practice of failing to properly investigate complaints and/or failing to complete investigations into allegations of misconduct against its officers by citizens.

22.     Upon information and belief, including but not exclusively limited to public record correspondences of the PGPD, PGPD ranking officers created a quota system under Chief Stawinski's command to incentivize officers to conduct more citizen contacts, dismissing officers who failed to deliver productivity stats, despite the known illegality of quotas.

23.     In October 2000, the DOJ initiated a pattern and practice investigation regarding use of excessive force throughout the PGPD and concluded that an unconstitutional pattern of excessive force pervaded their ranks. This investigation resulted in the County and Department entering a "Memorandum of Agreement" with the Department of Justice in January 2004. Pursuant to the Memorandum of Agreement, the Department was required to overhaul its use of force and reporting protocols, including review of use of force, its officer training, its processes for reviewing and tracking other officer misconduct allegations, and enhancing its "early identification system" to record all uses of force, all complaints, and all disciplinary actions taken against officers.

24.     Upon information and belief, including but not exclusively limited to the fact that PGPD discontinued racial bias training of its officers under Chief Stawinski's command, despite having knowledge of text messages between white PGPD officers during a call for service which stated, *"We ought to bring back public hangings"* and images that captured a training dummy that Caucasian officers donned with an afro wig and black face, PGPD leadership has persistently and systemically failed to enforce its policies regarding civilian interactions, particularly complaints of racial bias by its officers.

25.     Upon information and belief, including but not exclusively limited to the fact that PGPD Majors Mills, Mints, and Weaver, among other PGPD Commanders, never reviewed any of the use of force incident reports arising under their commands during the years 2016 to 2019,

there was widespread non-compliance between the years 2016 and 2019 with PGPD departmental policy mandating a final command review by supervisor officers of all use of force incident reports as required by PGPD General Order Volume II, Chapter 57. Therefore, the goals of that Order, to assess, among other things, whether officers are properly trained in use of force techniques and whether their use of force was within Departmental guidelines, were internally sabotaged.

26.     Upon information and belief, including but not exclusively limited to the fact that from 2016-2019, PGPD reviewed 1,219 uses of force reports (and in each and every instance, including but not limited to those discussed *supra*, PGPD commanders determined no unreasonable force occurred) and that in that same timeframe, 6,805 uses of force occurred, PGPD ignored its reporting policies and procedures regarding use of force.

27.     Upon information and belief, including but not exclusively limited to the fact that from 2016-2019 only 0.2 percent of the 6,805 uses of force were deemed "unjustified," and Internal Affairs only investigated a third of the unjustified uses of force, PGPD had and still has a custom of not investigating uses of force.

28.     In furtherance of its custom of not investigating its officers' uses of force, upon information and belief, PGPD did not properly investigate Strong's uses of force, nor did they adequately discipline, monitor, or train Strong upon learning of his prior uses of unreasonable force.

29.     PGPD's Early Identification System Policy is codified in the PGPD General Orders Volume I, Chapter 14, which identifies the policy as "an integral part of the Department's police-community relations strategy" and advises that the policy "…benefits the public by minimizing the number of police employees who may be at risk for future disciplinary actions." PGPD was

required to use this data to manage risk and liability and to evaluate the performance of all officers specifically on whether their uses of force were reasonable and lawful.

30.     Under the policy, the Commander of the Internal Affairs Division is required to prepare a series of monthly and quarterly reports allowing a systemic review of significant events such as complaints and uses of force. The monthly reports are required to identify all officers who have been the subject of a combination of two or more uses of force or complaints within a 60-day period. The quarterly reports are required to identify all officers who have been the subject of a combination of three or more uses of force or complaints in a three-month period, or two complaints during that period.

31.     Under the Policy, when an officer is identified on either report, the officer's Commander, their Captain, their Lieutenant, and their direct supervisor are required to "personally meet with the subject employee," and the Commander is required to "respond back to the Chief of Police in writing, indicating the date and time of the interview, as well as the participants and results" including "their assessment and any intervention action taken." If no intervention is taken, the Commander . . . must articulate specific reasons for not taking action." Untimely reporting or the failure to report information impedes the purpose of the Department's policy of identifying "police employees who may be at risk for future disciplinary actions."

32.     Despite the federal mandate, PGPD has failed to meet its duty to screen out officers that the Department knew presented a clear risk of harm to County citizens, because the Policy in practice does not assess the effectiveness of the "command review" to determine whether it detects excessive uses of force by PGPD officers, and the Policy allows Commanders to ignore patterns of unreasonable use of force or discrimination employed by an officer whose force is being reviewed in making an evaluation.

33.     Instead, the required monthly reports prepared by PGPD Internal Affairs Division pursuant to the Policy do not identify officers who are the subject of two or more uses of force or complaints within a 60-day period as prescribed. Rather, the reports only identify officers who had two uses of force within a calendar month, thereby only capturing a fraction of the officers the system was designed to flag.

34.     Additionally, when PGPD Commander Mills took the helm of the Internal Affairs Division in 2015, she stopped producing the required quarterly reports altogether.

35.     PGPD Chief Stawinski's testified under oath that even when officers were flagged and evaluated under his command, their Commanders would not report back to him with the result as required by the Early Identification System Policy. PGPD ranking officers refusal to adhere to their own policy undermined the very purpose of the reporting system by failing to identify officers, like Defendant Strong, who PGPD leaders knew through their own training, knowledge, and experience would likely violate community members, just as he ultimately did to Demonte Ward-Blake.

36.     As a direct and proximate result of PGPD's tolerance, encouragement, and condonation of using excessive force, upon information and belief, Defendant Strong was never properly flagged pursuant to the Early Identification System despite having used force against County citizens nearly 30 times from 2016 to 2019. Instead, he was permitted by his ranking officers to brutalize other citizens, just as he ultimately did to Demonte Ward-Blake.

37.     On September 10, 2020, Defendant Strong was indicted by a Prince George's County grand jury with 2nd Degree Assault, Reckless Endangerment, and Misconduct in Office for his egregious attack on Demonte.  His criminal trial remains pending.

## CLAIMS

### COUNT I

**42 U.S.C. §1983**
**Unconstitutional Custom, Pattern or Practice of Unlawful Seizure,**
**Excessive Use of Force, and Improper Use of Police Powers**
**(*Monell* Claim)**

**(Plaintiff Estate of Demonte Ward-Blake against Defendant County)**

38.     Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

39.     At all relevant times herein, Defendant County was a state actor and a "person" within the meaning of 42 U.S.C. § 1983 and its conduct was and is subject to 42 U.S.C. § 1983.

40.     At all relevant times herein, Decedent Ward-Blake had rights under the Fourth and Fourteenth Amendments not to have his person or property unlawfully seized in an unreasonable manner, not to be deprived of his liberty without due process of law, not to be summarily punished, and not to be subjected to the use of unreasonable and excessive force.

41.     It is established now and was clearly established at the time of Strong's actions that the conduct, pattern, and practices of Defendant County violated the Fourth and Fourteenth Amendment to the U.S. Constitution.

42.     Defendant Strong, while acting under color of law, deprived Decedent Ward-Blake of his clearly established and well-settled rights under the Fourth and Fourteenth Amendment of the U.S. Constitution not to have his person or property unlawfully seized, not to be deprived of liberty without due process of law, not to be summarily punished, and not to be subjected to the use of unreasonable and excessive force.

43.    As alleged herein, the actions by Defendant Strong were objectively unreasonable, excessive, absent any lawful justification and/or excuse, and was in keeping with the pattern practice, policy and/or custom of Defendant County.

44.    Under the Fourth and Fourteenth Amendments to the United States Constitution, Defendant County is prohibited from allowing, enabling, and facilitating its officers to engage in a pattern, practice, policy, or custom of violating citizens' constitutional rights and is obligated to train and supervise its officers in the recognition and handling of incidents of misuse of police powers and rights violations committed by Defendant County's police officers, as well as recognizing patterns of systemic perpetuation of the same.

45.    PGPD sworn police officers, including Defendant Strong, persistently engaged in a widespread practice of unconstitutional conduct of unlawfully seizing and using excessive force against citizens. It was of such a duration and frequency such that it had become customary and standard operating procedure among the PGPD's police officers, and the County knew or should have known of the widespread violations.

46.    By establishing, executing, implementing, enforcing, directing, supervising and/or controlling polices, customs, practices, usages, and procedures to be used by PGPD officials and officers, as set forth supra, Defendant County, while acting under color of law, engaged in a pattern and practice of unconstitutional conduct.

47.    Defendant County engaged in a pattern, practice, policy, or custom of allowing, enabling, and/or facilitating its officers to use excessive and unlawful force in connection with subduing and/or apprehending individuals. Defendant County has also engaged in a pattern, practice, policy, or custom of allowing, enabling, and facilitating its officers to conduct unlawful

seizures and has permitted officers to commit further unlawful uses of various types of police force and conduct.

48.     As identified supra, at all relevant times, the County maintained a custom, policy, and/or practice of condoning officers' conduct in knowingly, consciously, and repeatedly failing to stop or correct the widespread pattern of unconstitutional uses of force and seizures.

49.     The County, through specific intent or deliberate indifference, failed to correct and otherwise hold Strong and other PGPD police officers accountable for their abuse of police powers and continued and repeated unconstitutional uses of force and unlawful seizures. By failing to correct the officers' pervasive constitutional violations, including Strong, the County injured Decedent Ward-Blake, thereby committing an independent act under §1983 by condoning the pattern and practice of unconstitutional use of force, unlawful seizures, and abuse of police powers by its officers, including Strong.

50.     Defendant County acted with reckless disregard for or with deliberate indifference to whether Decedent Ward-Blake's rights would be violated by its actions and that such actions were the moving force in violating his rights.

51.     As a direct and proximate result of Defendants' actions or omissions identified herein, Decedent Ward-Blake sustained significant physical, emotional, mental, and financial injuries, including, but not limited to mental and physical pain and suffering, mental anguish, humiliation, disgrace, loss of dignity, and other expenses.

WHEREFORE, Plaintiff Rena Ward on behalf of the Estate of Demonte Ward-Blake requests that this Court enter judgment in favor of the Estate of Demonte Ward-Blake, and against Defendant County, in excess of $75,000,000.00 in compensatory damages, specific amount to be

determined at trial, plus costs and interest, and any other such relief that this Court deems just and proper and any further relief as the nature of the case may require.

## COUNT II

**42 U.S.C. §1983**
**Unconstitutional Custom, Pattern and/or Practice of**
**Failure to Train, Supervise, and Discipline**
**(*Monell* Claim)**

**(Plaintiff Estate of Demonte Ward-Blake against Defendant County)**

52.     Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

53.     Under the Fourth and Fourteenth Amendments to the United States Constitution, Defendant is prohibited from allowing, enabling, and facilitating the Department's officers to engage in a pattern, practice, policy or custom of violating citizens' constitutional rights and is obligated to train and supervise officers in the recognition and handling of incidents of corruption, misuse of police powers, and rights violations committed by the Department's officers, as well as recognizing patterns of systemic perpetuation of same.

54.     As alleged herein, Defendants engaged in a pattern, practice, policy, and/or custom of indifference to incidents of Defendant County officers and Strong using excessive and unlawful force in connection with seizing, subduing and/or apprehending individuals.

55.     As identified supra, the training, supervision, and oversight required by Defendant County regarding incidents of misuse of police powers, and rights violations committed by Defendant County's officers was inadequate, insufficient, or nonexistent, and Defendant County, directly and through its employees, agents and officers, failed to adequately train, supervise and discipline its employees, agents, and officers under its direction and control, including Strong.

56.     The County's final policy making officials, ranking officers, and supervisors had actual or constructive knowledge of the pervasive and persistent pattern and practice that its officers were engaged in, including Defendant Strong, whose conduct violated clearly established rights, and that this conduct posed an unreasonable risk of constitutional injury to Decedent Ward-Blake and its citizens in general.

57.     Defendant County failed to properly handle the recurring instances of constitutional violations, both generally and specifically as to Defendant Strong, and it failed to adequately supervise and discipline its police officers, both generally and specifically as to Defendant Strong. Defendant County's failure to adequately train and supervise further articulates the aforementioned unconstitutional pattern and practice. As alleged herein, Defendant County and Defendant Strong engaged in a pattern, practice, policy, or custom of allowing Defendant County's officers to use excessive and unlawful force, conduct illegal seizures, and improperly use police powers.

58.     Defendant County knew that it was highly probable and predictable that the use of excessive force, unlawful seizures, and the improper use of police powers would occur without adequate training, supervision and/or discipline of its police officers, including Defendant Strong because there was a pattern of similar constitutional violations known within the PGPD. It was foreseeable and highly predictable that failing to properly supervise Defendant Strong in the proper use of force, handling of incidents of corruption, misuse of police powers, and civil rights violations committed by Defendant County's officers would, and in fact did, result in the violation of Plaintiff's constitutional rights as alleged herein and Defendant County was deliberately indifferent to same.

59.     Despite this knowledge, Defendant County took no action to prevent or remedy the misconduct by Defendant Strong and other PGPD police officers. Defendant County routinely

failed to supervise and discipline Officer Strong and other PGPD officers, thus allowing the misconduct to continue and thrive.

60.    As alleged herein, the actions taken by Defendant Strong against Decedent Ward-Blake were unreasonable, excessive, absent any lawful justification and/or excuse, and were a direct result of Defendant County's failure to adequately train, supervise, oversee, and discipline its employees as it relates to the proper use of police force. Defendant County's failure to properly train, oversee, supervise, and discipline its employees was tantamount to deliberate indifference.

61.    As alleged herein, the actions by Defendant Strong were objectively unreasonable, excessive, absent any lawful justification and/or excuse, and were in keeping with the pattern practice, police and/or custom of the Defendant County.

62.    Defendant County subjected Decedent Ward-Blake to these deprivations of his rights maliciously and/or acting with reckless disregard for or with deliberate indifference to whether Decedent Ward-Blake's rights would be violated by its actions and that such actions were the moving force in his having such rights violated and incurring his injuries. Defendant County's actions and/or omissions as described herein, were intentional, wanton, willful, malicious, and/or manifested blatant and reckless disregard for Plaintiff's constitutionally protected rights, and as such Plaintiff is entitled to compensatory damages from Defendant County.

63.    As a direct and proximate result of Defendants' actions or omissions identified herein, Decedent Ward-Blake sustained physical, emotional, mental, and financial injuries, including, but not limited to pain and suffering, mental anguish, humiliation, disgrace, loss of dignity, and other expenses. Plaintiffs' liberty and property were deprived without the judgment of his peers or by the law of the land.

WHEREFORE, Plaintiff Rena Ward on behalf of the Estate of Demonte Ward-Blake requests that this Court enter judgment in favor of the Estate of Demonte Ward-Blake, and against Defendant County in an amount in excess of $75,000,000.00 in compensatory damages, specific amount to be determined at trial, plus costs and interest, and any other such relief that this Court deems just and proper and further relief as the nature of the case may require.

## COUNT III

### 42 U.S.C. §1983
### Excessive Force / Improper Use of Police Powers

### (Plaintiff Estate of Demonte Ward-Blake against Defendant Strong)

64.     Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

65.     At all times relevant to this Complaint, Defendant Strong was acting under the color of state law as a sworn police officer employed by Defendant County.

66.     Under the Fourth and Fourteenth Amendments to the United States Constitution, Defendant Strong was prohibited from using excessive force in his efforts to seize, detain, and/or search Plaintiffs.

67.     The actions of Defendant Strong as detailed herein constitute excessive and unlawful force in gross violation of Plaintiffs' rights under the Fourth and Fourteenth Amendments of the United States Constitution and the guarantees set forth in 42 U.S.C. §1983.

68.     Decedent Ward-Blake did not pose an immediate threat to the safety of officers or to anyone else, was not armed, and was not resisting lawful arrest, and was not attempting to flee a lawful apprehension at the time excessive force was used.

69.     The force used by Defendant Strong was intentional, excessive, objectively unreasonable, absent any lawful justification or excuse, unconstitutional, and unlawful force in the restraint and/or apprehension of Decedent Ward-Blake.

70.     Defendant Strong's conduct violated Decedent Ward-Blake's constitutional rights to be free from unreasonable searches and seizures and the use of excessive force, and those rights were clearly established at the time of the violation.

71.     Defendant Strong's actions or omissions as described herein, were intentional, wanton, willful, malicious, manifestly blatant, callous, and in reckless disregard for Decedent Ward-Blake's constitutionally protected rights, and as such his Estate is entitled to compensatory and punitive damages from Defendant Strong, individually.

72.     As a direct and proximate result of Defendants' actions or omissions identified herein, Plaintiffs sustained physical, emotional, mental, and financial injuries, including, but not limited to conscious pain and suffering, mental anguish, humiliation, disgrace, loss of dignity, and other expenses. Plaintiffs' liberty was deprived without the judgment of his peers or by the law of the land.

WHEREFORE, Plaintiff Rena Ward on behalf of the Estate of Demonte Ward-Blake requests that this Court enter judgment in favor of the Estate of Demonte Ward-Blake, and against Defendant Strong in an amount in excess of $75,000,000.00 in compensatory damages, specific amount to be determined at trial, plus costs and interest, punitive damages, and any other such relief that this Court deems just and proper and further relief as the nature of the case may require.

## COUNT IV

**Maryland Declaration of Rights Article 24: Deprivation of Liberty
and Property, Excessive Force & Homicide**

**(Plaintiff Estate of Demonte Ward-Blake against Defendants)**

73.     Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

74.     At all times relevant to this Complaint Defendant Strong was acting under the color of state law as an officer employed by Defendant County.

75.     Defendants violated Decedent Ward-Blake's civil rights and due process as set forth in the Maryland State Constitution and the Declaration of Rights, including Article 24.

76.     Defendants violated Decedent Ward-Blake's civil rights and due process as set forth in the Maryland State Constitution and the Declaration of Rights, including Defendants' intentional acts of misconduct, illegal detention and arrest, excessive force, and false imprisonment.

77.     Defendants used excessive force when they brutally assaulted Decedent Ward-Blake.

78.     The force used by Defendants was intentional, excessive, objectively unreasonable, absent any lawful justification or excuse, unconstitutional, and unlawful force in the restraint and/or apprehension of Decedent Ward-Blake.

79.     Defendants engaged in intentional acts of misconduct, including excessive force, and false imprisonment which violated Decedent Ward-Blake's civil rights and due process.

80.     Defendant Strong's conduct was without legal justification and was improperly motivated by ill will and actual malice. Defendant Strong intended to harm Decedent Ward-Blake's when, with excessive force and without probable cause, he brutally assaulted him.

81.     Defendant Strong used unreasonable and unnecessary force in the treatment of the Decedent Ward-Blake's, thereby injuring as alleged in violation of his rights to due process and to be free from excessive force as protected by Article 24 of the Maryland Declaration of Rights. Defendant Strong's actions were without provocation and without justification and with the intent to violate the civil rights of Decedent Ward-Blake's, as well as his under Article 24 of the Maryland Declaration of Rights.

82.     Decedent Ward-Blake did not have the freedom to leave during the detention and arrest.

83.     Defendant Strong's conduct was objectively unreasonable in light of the facts and circumstances that confronted him.

84.     Defendant County is vicariously liable to Plaintiffs for Defendant Strong's violations of Decedent Ward-Blake's rights under Article 24 of the Maryland Declaration of Rights.

85.     Defendants' actions or omissions as described herein, were intentional, wanton, willful, malicious, manifested blatant and reckless disregard for Decedent Ward-Blake's constitutionally protected rights, and as such his Estate is entitled to compensatory and punitive damages from Defendants individually.

86.     As a direct and proximate result of Defendants' actions or omissions identified herein, Decedent Ward-Blake sustained physical, emotional, mental, and financial injuries, including, but not limited to, death, conscious pain and suffering, mental anguish, humiliation, disgrace, loss of dignity, and other expenses. Plaintiffs' liberty and property were deprived without the judgment of their peers or by the law of the land.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor, and against Defendants, jointly and severally, in an amount in excess of $75,000.00 in compensatory damages, specific amount to be determined at trial, plus costs and interest, punitive damages, and any other such relief that this Court deems just and proper and further relief as the nature of the case may require.

## COUNT VII

### Assault and Battery

### (Plaintiff Estate of Demonte Ward-Blake against Defendants)

87.     Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

88.     At all times relevant to this Complaint, Defendant Strong was acting under the color of state law as an officer employed by Defendant County.

89.     Defendant Strong assaulted and battered Decedent Ward-Blake when he unlawfully seized him.

90.     Defendant Strong's actions raised in the Decedent Ward-Blake's mind an apprehension of imminent bodily harm when he unlawfully seized him.

91.     Decedent Ward-Blake was threatened by Defendant Strong who had possessed the apparent present ability to carry out that threat.

92.     Defendant Strong intentionally touched Decedent Ward-Blake in a harmful or offensive manner when he unlawfully seized Decedent Ward-Blake. Decedent Ward-Blake did not give Defendant Strong permission to touch him in that or any other manner.

93.     Defendant Strong's conduct was without legal justification and was intentional. Defendant Strong acted as the County's agent, servant, and/or employee when he assaulted and battered Plaintiffs.

94.     Defendant Strong's conduct was committed within the scope of his employment with Defendant County, thus Defendant County is vicariously liable for his tortious actions committed against Decedent Ward-Blake.

95.     As a direct and proximate result of these acts, Decedent Ward-Blake sustained physical, emotional, mental, and financial injuries, including, but not limited to pain and suffering, mental anguish, humiliation, disgrace, loss of dignity, loss of life, and other expenses.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor, and against Defendants, jointly and severally, in an amount in excess of $75,000.00 in compensatory damages, specific amount to be determined at trial, plus costs and interest, punitive damages, and any other such relief that this Court deems just and proper and further relief as the nature of the case may require.

## COUNT VIII

### Negligence

### (Plaintiffs against Defendant County)

96.     Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

97.     At all times relevant to this Complaint Defendant County was acting under the color of state law.

98.     Defendant County owed Plaintiffs a duty to exercise due care in the daily operation of its police department to avoid causing unreasonable yet foreseeable physical or mental injury to Plaintiffs.

99.     Defendant County breached these duties to Plaintiffs by its actions and inactions noted throughout this Complaint.

100.    Defendant County's negligence proximately caused the injuries that Plaintiffs sustained. All of Plaintiffs' injuries were caused solely by the negligence of Defendant County without any contributory negligence by Plaintiffs.

101.    As a result of these acts, Plaintiffs sustained physical, emotional, mental, and financial injuries, including, but not limited to pain and suffering, mental anguish, humiliation, disgrace, loss of dignity, and other expenses. Plaintiffs' liberty and property was deprived without the judgment of their peers or by the law of the land.

WHEREFORE, Plaintiffs request that this Court enter judgment in each of their favor, and against Defendants, jointly and severally, in an amount in excess of $75,000.00 in compensatory damages, specific amount to be determined at trial, plus costs and interest, punitive damages, and any other such relief that this Court deems just and proper and further relief as the nature of the case may require.

## COUNT IX

### Gross Negligence

### (Plaintiff Estate of Demonte Ward-Blake against Defendants)

102.    Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

103.    At all times relevant, Defendant Strong was acting under the color of state law as a police officer employed by Defendant County.

104.    Defendant Strong engaged in intentional, willful and wanton misconduct and with a reckless disregard for the consequences to Decedent Ward-Blake. Defendant Strong intentionally inflicted bodily injury to Decedent Ward-Blake and acted with recklessness towards his rights and wellbeing.

105.    Defendant Strong's gross negligence proximately caused the injuries that Decedent Ward-Blake sustained. All of Decedent Ward-Blake's injuries were caused solely by the gross negligence of Defendant Strong without any contributory negligence by Plaintiff.

106.    Defendant Strong's conduct was without legal justification and was improperly motivated by a reckless disregard for the consequences to Decedent Ward-Blake. Defendant Strong intended to harm Decedent Ward-Blake when, with excessive force, he seized and assaulted Decedent Ward-Blake without legal justification.

107.    Defendant Strong's conduct was committed within the scope of his employment with Defendant County, thus Defendant County is vicariously liable for his tortious actions committed against Decedent Ward-Blake.

108.    As a result of these acts, Decedent Ward-Blake sustained physical, emotional, mental, and financial injuries, including, but not limited to, death, conscious pain and suffering, mental anguish, humiliation, disgrace, loss of dignity, and other expenses.

WHEREFORE, Plaintiff Rena Ward on behalf of the Estate of Demonte Ward-Blake requests that this Court enter judgment in favor of Estate of Demonte Ward-Blake, and against Defendants, jointly and severally, in an amount in excess of $75,000.00 in compensatory damages, specific amount to be determined at trial, plus costs and interest, punitive damages, and any other

such relief that this Court deems just and proper and further relief as the nature of the case may require.

## COUNT X

### Negligent Hiring, Training, and Supervision

### (Plaintiffs against Defendant County)

109.    Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

110.    At all times relevant to this Complaint, Defendant Strong was acting under the color of state law as officers employed by Defendant County.

111.    Defendant County maintained a duty to use reasonable care in hiring, training, and supervising individuals competent and fit to perform the duties of a police officer.

112.    Defendant County knew or should have known that Defendant Strong proved unfit for his assigned duties. Defendant County is obligated to train and supervise officers in the recognition and handling of incidents of corruption, misuse of police powers such as the use of excessive force, and rights violations committed by Defendant County's officers, as well as recognizing patterns of systemic perpetuation of same.

113.    At all relevant times, Defendant County, directly and through its officers and agents had an obligation to ensure that its officers, employees, and agents, exercised the same degree of care that a reasonable and prudent person would exercise in the same or similar situation with respect to the training, supervision, and oversight of all employees, agents, and officers under its direction and control.

114.    As identified supra, Defendant Strong's use of excessive force and violation of citizens' civil rights rendered him incompetent to provide law enforcement.

115.    As identified supra, the training, supervision, and oversight required by Defendant County regarding incidents of misuse of police powers, and rights violations committed by Defendant County's officers was inadequate, insufficient, or nonexistent, and Defendant County, directly and through its employees, agents and officers, failed to exercise the above requisite degree of care in the supervision of all employees, agents, and officers under its direction and control.

116.    Defendant County had actual or constructive knowledge of the pervasive and persistent pattern and practice that its officers, including Defendant Strong, were engaged in conduct that violated clearly established rights, and that this conduct posed an unreasonable risk of constitutional injury to Plaintiffs. Defendant County knew or should have known of Defendant Strong's propensity to violate citizens' civil rights and to use excessive force.

117.    In spite of this knowledge, Defendant County took no adequate action to prevent or remedy the misconduct by Defendant Strong and/or other PGPD police officers. It was deliberately indifferent to the persistent constitutional violations by Officer Strong and other PGPD officers whom it directly supervised. In breach of its duties, Defendant County routinely failed to supervise and discipline Officer Strong and other PGPD officers, thus allowing the misconduct to continue and thrive.

118.    Defendant County knew or should have known that Defendant Strong would come into contact with the public. By virtue of Defendant County's negligent hiring, training, and supervision, the risk that Defendant Strong would violate the constitutional rights of Plaintiffs was foreseeable.

119.    Defendant County failed to properly supervise Defendant Strong and other employees in the proper handling of incidents of corruption, misuse of police powers, and rights violation committed by Defendant PGPD's officers.

120.    It was foreseeable that failing to properly train and supervise PGPD officers, including Defendant Strong, in the proper handling of incidents of corruption, misuse of police powers, and rights violation committed by Defendant County's officers would, and in fact did, result in the violation of Plaintiffs' constitutional rights as alleged herein and Defendant County was indifferent to same.

121.    As a direct and proximate result of Defendant's actions or omissions identified herein, Decedent Ward-Blake sustained physical, emotional, mental, and financial injuries, including, but not limited to pain and suffering, mental anguish, humiliation, disgrace, loss of dignity, and other expenses.

122.    Defendant County subjected Decedent Ward-Blake to these deprivations of his rights maliciously and/or acting with reckless disregard for or with deliberate indifference to whether Plaintiffs' rights would be violated by such actions and that such actions were the moving force in his having such rights violated and incurring their injuries.

123.    As a direct and proximate result of Defendants' actions or omissions identified herein, Decedent Ward-Blake sustained physical, emotional, mental, and financial injuries, including, but not limited to pain and suffering, mental anguish, humiliation, disgrace, loss of dignity, and other expenses.

WHEREFORE, Plaintiff Rena Ward on behalf of the Estate of Demonte Ward-Blake requests that this Court enter judgment in favor of the Estate of Demonte Ward-Blake, and against Defendants County in an amount in excess of $75,000.00 in compensatory damages, specific

amount to be determined at trial, plus costs and interest, and any other such relief that this Court deems just and proper and further relief as the nature of the case may require.

**COUNT XI**

**Wrongful Death**

**(Plaintiff Rena Ward against Defendants)**

124.    Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

125.    Plaintiff Rena Ward is the Decedent's mother and is a primary beneficiary in this action pursuant to Md. Code Ann., Cts. & Jud. Proc. § 3-904. She has brought this action within the appropriate time limits set forth in the Maryland Wrongful Death Act.

126.    Defendant Strong permanently paralyzed Decedent Ward-Blake when he slammed him on his face on October 17, 2019. As a result, Decedent's near complete quadriplegia was a contributing factor to his death on August 1, 2021.

127.    Decedent had done nothing to warrant the use of deadly force, and there was no legal justification for Defendant Strong to use such force. Defendant Strong acted with ill will and actual malice.

128.    Each of the Defendants, individually or through its agents, servants, or employees were directly and proximately responsible for the fatal injuries suffered by Decedent Ward-Blake. Plaintiffs injuries were caused by the actions of the Defendants without any wrongdoing on their part.

129.    In committing the foregoing acts, Defendant Strong was acting in his official capacity as a Prince George's County police officer and acting within the scope of his employment.

130.     As a direct and proximate result of Defendant Strong's acts, Plaintiff Rena Ward, the surviving mother, sustained pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of protection, loss of care, loss of attention, loss of advice, loss of counsel, loss of training, loss of guidance, and loss of education.

WHEREFORE, Plaintiff Rena Ward request that this Court enter judgment in her favor, and against Defendants, jointly and severally, in an amount in excess of $75,000.00 in compensatory damages, specific amount to be determined at trial, plus costs and interest, and any other such relief that this Court deems just and proper and further relief as the nature of the case may require.

## REQUEST FOR RELIEF

**WHEREFORE**, as to each and every count pled, Plaintiffs respectfully request that this court award them:

A. Judgment in favor of each Plaintiff and against Defendants, individually and/or jointly and severally, finding Defendants liable to Plaintiffs;

B. Award each Plaintiff compensatory damages in an amount which exceeds

    a.  $75,000,000.00, specific amount to be determined at trial, plus interest and costs as Counts I, II & III;

    b.  $75,000,00, specific amount to be determined at trial, plus interest and costs as to Counts III - XI;

C. Reimburse each Plaintiff all costs paid by each Plaintiff or on behalf of each Plaintiff in connection with the incident in an amount to be determined at trial;

D. Award Plaintiffs the costs and expenses of this case, including attorneys' fees;

E. Award Plaintiffs pre-judgement and post-judgement interest;

F.   Award Plaintiffs punitive damages against Defendant Strong, in an amount to be
     determined at trial, and

G.   Award any other such relief that this Court deems just and proper and further relief
     as the nature of the case may require.


Dated: February 21, 2022                     Respectfully submitted,

                                             MURPHY, FALCON & MURPHY

                                             By: /s/ *Malcolm P. Ruff*
                                             William H. Murphy, Jr. (Bar # 07985)
                                             Malcolm P. Ruff (Bar # 21595)
                                             One South Street, Suite 3000
                                             Baltimore, MD 21202
                                             Telephone: (410) 951-8744
                                             Facsimile: (410) 539-6599
                                             Email: billy.murphy@murphyfalcon.com
                                             Email: malcolm.ruff@murphyfalcon.com
                                             *Attorneys for Plaintiffs*


## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on the issues set forth in this Complaint.


                                             /s/ *Malcolm P. Ruff*
                                             Malcolm P. Ruff (Bar # 21595)